The third and final case for argument this morning is 24-1657, Technology in Ariscale v. Razer USA. Mr. Fitzgerald, please proceed. Hello, Your Honors. May it please the Court, my name is Brian Fitzgerald and I'm representing Plaintiff Appellant, Technology in Ariscale, LLC. Appellant submits that the District Court erred in holding Asserted Claims 1 and 14 of the 652 patent invalid under the ALIS test. Regarding ALIS Step 1, the Asserted Claims are not directed to an abstract idea, but are instead directed to an improvement in computer networking realized by improving a computer's ability to accurately decode a specifically formed wireless signal through error correction of the important downlink frame prefix information. Counsel, do you disagree with the District Court's characterization of the claims as being directed to receiving, manipulating, and decoding data? Yes. That characterization of the claims couches the focus of the claims under Step 1 of the ALIS test as using a computer as a tool to perform an abstract process. This is not what the claims are directed to. The claims are directed to improving the computer's ability to function as a tool and improving the computer's ability to... Is this a specialized computer of any kind? No, this is not a specialized computer. It's an off-the-shelf computer that you can configure and you can have it do different things, right? Yes. Yes, Your Honor. This computer... The invention is to improve the computer's ability to accurately decode the wireless transmission signal. So, when the specifically recited signal is transmitted through a channel, it will inevitably be exposed to noise interference. This noise interference will introduce errors into the symbols of downlink frame prefix information and their corresponding repeated symbols. These errors could result in the symbols having their values altered, causing the symbols to be incorrectly decoded when they're utilized as inputs at the decoder. Counsel, do you have access to the appendix? Yes. Or an action to your brief as well, your blue brief? Yes. Can you turn to page 20? 20 of the brief? Yes, please. So, at the bottom of the blue brief, which your side would have authored, do you agree with this sort of recitation of the description of Claim 1 where it talks about Claim 1 reciting combined and decoding repeatedly transmitted DFP information? Yes, I believe that Claim 1 does recite the combining and decoding of the downlink frame prefix information. Okay. So, the downlink frame prefix information, as the specification recites, is important information that is arranged at the beginning of a transmitted frame, and it includes important control information for the subsequent data in the frame, and if it's not properly received, the whole signal could be adversely affected, the reception of the whole signal could be adversely affected, because the information in the downlink frame prefix is important for the decoding of all the subsequent data. So, essentially, by combining the symbols of downlink frame prefix information with repeated symbols of downlink frame prefix information, it improves the signal-to-noise ratio of the intended signal versus the introduced errors by noise interference, and it allows for the computer to accurately decode the downlink frame prefix information. So, it's providing a concrete improvement to the computer's ability to receive and decode the wireless signal, rather than simply using the computer merely as a tool to decode an otherwise abstract decoding process. What's the advantage here? The advantage, Jetrena, is that the computer is more likely to accurately decode a signal, so it's an improvement in the computer's wireless signal reception. In its reception? Yes. Show me where in the claim you have that. So, in the claim, it says... Which claim, 1? Claim 1. There's similar language in Claim 14. In Claim 1, it says, Combining, using a computer processor, symbols at the same positions of deinterleaved encoding blocks among the repeated symbols in the deinterleaved transmission signal. The repeated symbols have antecedent basis in the preceding paragraph, and it says, Repeating symbols including downlink frame prefix information. So, the repeated symbols include at least the downlink frame prefix information, and then it requires the decoding the combined symbols. So, reading from the specification, this could be found in Appendix 51. Right there, show me the improvement in technology. So, the improvement, and this is what I was getting at, Jetrena, in Appendix 51, which refers specifically to Column 2, lines 42 through 48 of the 652 patent. I want to see it in the claim. Yeah, in the claim, it's the fact that you're combining the repeated symbols, and then you're decoding the combined symbols. That's the technical solution, because by combining the symbols, you're strengthening the intended value of those symbols in relation to any noise interference that has been introduced into the signal. Do you agree that the combining step only encompasses conventional methods? No, Your Honor, I disagree. Why do you disagree? I disagree for... Point me to something that would show that it encompasses something other than conventional methods. Yes, I disagree for two reasons. First, the combining step requires the combining of specific symbols of a specific portion, the downlink frame prefix, of a specifically formed signal, and that's the first reason. Individually, that's an oversimplification of the combining step. The second reason is that the combining step can't be analyzed as like a disparate individual element. It has to be analyzed in view of the ordered combination that it is actually combined and then decoded. That's the... From what I was getting at, reading from the specification, it says... Where are you in the specification? What column are you in? Okay, this is going to be on Appendix 51, Judge Cunningham. Column 2, lines 42 through 48. So it says... It is an object of the present invention to improve reception performance of the frame control header, including downlink frame prefix information, by combining and decoding the downlink frame prefix information repeatedly transmitted through the frame control header. As compared to a conventional decoding method, and to improve system performance by preventing the loss of information important to the data reception. So, by combining the symbols of the downlink frame prefix information, which includes important control information for the whole signal, with repeated symbols of the specifically formed signal where the symbols are repeated, you are strengthening the intended signal in relation to the noise, the signal-to-noise ratio. In answering our questions, you're using the word specific a lot, and specificity. But, frankly, I don't see that same specificity in the claim, or even in the portions of the specification that you're pointing us to. So is there something that you could actually show us that has the specificity that you're referring to? Yes. So, there's a specifically generated signal. It says, the very first paragraph of Claim 1, Your Honor, it says, Receiving using a computer processor the transmission signal, which is formed by, 1. Repeating symbols, including downlink frame prefix information. 2. Encoding the repeated symbols into encoding blocks. And 3. Interleaving the encoding blocks. So, that's a specifically formed signal. Then, in the combining step, it specifically says, You're combining symbols at the same positions of de-encoding blocks among the repeated symbols, which include the downlink frame prefix information. And, you're decoding the combined symbols. So, the combining and decoding of the repeated symbols of the downlink frame prefix information, which is recited in Appendix 51, is captured in the claims as well, Your Honor. You spent some time focused on Step 1, but what if we disagree with you on Step 1 and pretend that it's actually directed to an abstract idea? What is your best argument in terms of Step 2 and Inventive Concept? In terms of Step 2, I would say that the Inventive Concept is, by combining and then decoding the downlink frame prefix information as claimed, it improves the signal reception and the ability of the computer to accurately decode the signal, because when the combined symbols are received as inputs of the decoder, the signal-to-noise ratio is increased, allowing... That sounds like the same abstract idea that you're expressing in Step 1. So, you don't get past Step 2 by restating the abstract idea. I'm sorry, Your Honor. Step 2 requires that... Regarding Step 2, the symbols of... Basically, how it works is the specifically-formed signal that has downlink frame prefix information and repeated symbols of downlink frame prefix information is transmitted through the channel. So, it will be exposed to noise, which interferes with the values of the symbols. By combining the symbols prior to decoding, the... Step 2 says, okay, under Step 1, we see that your claims are directed to an abstract idea. Under Step 2, is there anything else that renders that abstract idea into patent-eligible subject matter? And it seems to me that you're just simply expressing anew the abstract idea that you're arguing under Step 1. And if that's the case, you don't make it past Step 2. Your Honor, under Step 2, essentially, you're combining the symbols in order to reduce the signal-to-noise ratio, which is a concrete improvement over the conventional art. Okay, we're into your budget time, so why don't we hear from the other side and we'll say what we think. Good morning, Your Honor, State Police and Court. Chris Cow with Pillsbury-Winthrop Shaw Pittman on behalf of the defendant, Razor USA. The district court in this case got it right. It got it right twice, in fact, because the court considered an initial motion to dismiss the claims on a finding that the 652 patent was patent-ineligible under Section 101, but allowed the plaintiff the opportunity to amend the complaint to add further detail from the specification and attempt to establish that the invention was patent-eligible. On a second motion to dismiss, the court again, on full briefing and oral argument, considered the plaintiff's arguments and dismissed the case again. The claimed invention here is directed just to the transmission of data using conventional error-correction techniques. There are three techniques described in the patent that are all well-known and conventional and have been used for decades. They're so well-known that the patent specification, if you look at it, doesn't even really describe these techniques or any specific ways to conduct the techniques because they're known. People know how to do this. So there's interleaving of data. And again, there's no description of it. It just says you shall do this interleaving and then when you're downloading and decoding the transmission, you de-interleave. That's a technique for ensuring the integrity of a signal that's been well-known. It essentially means at a high level, if you have a file that you're transmitting wirelessly, rather than transmit it consecutively, you just break it up and randomize it. And that's to prevent against errors in transmission that typically happen at one segment. So rather than have a file be corrupted all in one part of the file, if you interleave it, there's a greater chance that only minor portions of that data will be affected. What about the combining step? Yes. So the combining step is, again, conventional. And again, it's not described in great detail in the patent, but essentially the combining step, all that this patent is saying is you take an average of repeated symbols. And a good way to think about that is, let's say you want to measure the height of somebody who is 60 inches tall. And instead of doing it once, you do it five times. Because that way, in coding and decoding, you basically repeat the signals to make sure, again, if there's transmission errors, you have additional copies of it. So if you take the measurement of somebody who's 60 inches tall five times, sometimes you might measure him at 59. Sometimes you might measure them at 60. Sometimes you might measure them at 61. If you do that five times, you divide it by five, you get the average. And in theory that average should be more accurate than if you were just to take the 59 measurement. Translate that into data transmission, that's all that's going on here. That's all the patent is saying by the combining step. It says when you encode and decode data, this is conventional, you will repeat the signal. You will repeat a certain symbol within a transmission. And in this case, let's just make it easy, two times. ... ... ... ... ... ... Yes, there is no technological problem that's being solved here. There's no technological solution. An unconventional technological solution that's being proposed. Again, with respect to the combining step, the only thing that this is saying is when there are repeated symbols instead of just taking one. So if a symbol, let's say a symbol stands for the number five, rather than just taking that symbol five the first time, if it's repeated, and let's just say it's repeated twice here, you add it up, five plus five, ten, and you divide it by two, which is the average, and there's your five again. But this is accounting for if there's errors in the transmission, one of those transmissions would be the number four, one would be six. If you average them, you're five, you're closer to the original signal. That's not a technological solution to a problem. That's just literally a mathematical function of taking an average, which is elementary school math. This is not a complicated algorithm or some new formula to improve data transmission or encoding or decoding. This is literally just taking the average of repeated numbers. Would it be akin to making sure you don't put all of your eggs in one basket? Correct. Which is what all of these other, which is what encoding is. So again the patent also talks about encoding and decoding. Encoding and decoding for error correction, and this court has considered this many times and looked at it in other contexts. All that means really when you're encoding for error correction is you're having multiple copies of the data sent in the transmission. So if you lose some you still have it. These are well-known conventional principles. And I should say it's instructive to look at the cases that are cited by the plaintiff where this court has found patentable inventions in this same area of data transmission because those cases are distinguishable because in each of those cases there really was an unconventional idea, an unconventional application of data transmission. So counsel, I think opposing counsel at least in the briefing was relying on cases like ENFISH. Do you want to go ahead and distinguish that case? Yeah. So with respect to ENFISH that case involves sort of specific changes to the technology at issue. So like the database technology at issue there. That is an improvement to what existed previously. Here there's no improvement it's simply using different conventional techniques and applying them to specific data in this case. This patent in particular concerns data transmitted according to the 802.16 standard, which is a standard which was colloquially known as YMAX. It doesn't really exist anymore, but that's what the patent concerns. And with respect to the other cases, so good cases to distinguish is the Caltech case that is cited by the plaintiff, which also involves error correction actually in data transmission. And we talked about the fact that traditionally in error correction you send multiple copies of a data file as a way of error correction to make sure if you lose some you have another copy of it. In the Caltech case, the invention there was also using math, but the notion there, the unconventional idea there that makes that patentable in the Caltech case was that there rather than sending three copies all the time or four copies all the time which was the norm, you picked however many copies. In the Caltech case, the patent said we can improve data transmission by not always sending four copies all the time. We can vary it and it'll still be as effective. So sometimes we might only send two copies. Sometimes we might send three copies. That's just as good as sending three copies all the time. So you're improving error correction. You're improving data transmission. That's what was at issue at Caltech. Another case that is cited is the Gamalto case. It was only cited in the appellant's reply brief. But again, very similarly there was an improvement. There was an unconventional technique being used there. In the Gamalto case, so in error correction, it turns out that we talked about you make multiple copies. The way you do that is actually you apply some algorithm which are called error correcting codes. None of this is discussed in the patent. This is all just well known. And the notion in the Gamalto case is similar to what happened in Caltech, rather than just using the same algorithm every time. So if I'm going to make three copies and I use one algorithm, typically what you would do, conventionally, you use the same algorithm to create three copies of your original data. That's error correction. In the Gamalto case, this court looked at the patent at issue there. And in that case, the inventor said, well, you don't have to always use that same algorithm three times to produce the three copies. You could vary that. And sometimes you might use a different algorithm to create one copy. And a different algorithm to create another copy. And the assertion there was that this also improves data transmission and encoding and decoding. But those cases represent unconventional new techniques to improve data transmission. Counsel, which of our cases that we've decided you think are most comparable or most analogous to this case? Sure. So I think as we cited in our brief, the ones that are closest are cases that talk about general encoding and decoding. And the fact that that, just claiming encoding and decoding, the conventional ways of doing it, are not patent eligible. And so there is the RecogniCorp versus Nintendo case. Let me get you the citation. 855 F3rd 1322. The RecogniCorp case itself also refers to the Digitech image technologies versus electronics for imaging case, which is 758 F3rd 1344. Both of those cases stand for the proposition that just claiming encoding and decoding of data, transforming data in known ways, is not patent eligible. And then there are other cases that I think are relevant. One being the electric power group versus Alstom 830 F3rd 1350 case, which generally holds that the manipulation of data and the presentation of data on its own, again, is not patent eligible. And that's essentially what's going on here. This is just data that's being transmitted wirelessly and the patent at issue here, the 652 patent, says just use known conventional ways of ensuring the reliability of the data transmission. And the fact that it uses multiple different ways, interleaving, encoding, combining, which is just taking the average, using three different conventional well-known ways of doing technology, it does not create something patentable. It could create something patentable, depending on how you order those different ways. The fact that the technology is conventional does not by itself mean that it does not present an innovative concept of any kind. Yes, I agree, Judge. In this case, though, the ordering does not matter. This is an issue that the district court addressed correctly, in my view. And if you look at the specification at figures 3 and 4, and in fact at claims 1 and 2 of the patent, the patent describes two different orders that you could do this. In one embodiment, which is covered in claim 1 and in figure 3, you deinterleave, so you restore the original order of the transmission. And then you do this averaging step, the double check. In figure 4, and in claim 2 of the patent, you actually do that in reverse. You do the combining, you do the averaging step to confirm the data that you receive, and then you do the deinterleaving. So the order in this case doesn't matter at all. There's no benefit, there's no difference in how you do it. And that's explicitly disclosed in the patent. So none of the cases that are cited by the plaintiff with respect to the ordered combination making a difference or creating a patentable invention here apply. Thank you. In this case, the order absolutely does matter. As stated in the specification, it's the combining and then decoding. Every single disclosed embodiment, including the ones from the unasserted claims that Appellee brings up, in every single disclosed embodiment without exception, the combining step and the deinterleaving step are performed before the decoding step. So what about what opposing counsel mentioned in terms of the order by pointing us to claims 1 and 2 of the patent, where in claim 1, deinterleaving happens before combining, and then in claim 2, it's the reverse? The important thing is that the combining happens before the decoding, as the specification sets forth in the Appendix 51. I'll explain a little bit about the unconventionality about the combining step. The ordered combination of combining and then decoding. So, as you can see, in wireless transmission configurations, typically you would expect to see the decoder perform an inverse order of operations to the encoder. So in our case, every claim requires a specifically formed symbol at the encoder level of 1, repeating symbols including downlink frame prefix information, 2, encoding those repeated symbols into encoding blocks, and 3, interleaving those encoding blocks. So you would expect in a conventional inverse order decoding scheme it would be a reverse of that 1-2-3 order, it would be a 3-2-1 order. So you would have first the deinterleaving step, which is the sister step to interleaving, then you would have the decoding step, which is the sister step to encoding, then you would have the combining step, which is the sister step to repeating. That's not what happens in any of the claims of the pattern, or any of the embodiments. In the assertive claims, for example, we have a 3-1-2 order of operations. So we have at first it's deinterleaved, then it's combined, and then it's decoded. So what we have here is a very unconventional order of operations, because we're encoding repeated symbols in the unencoded domain. So the symbols are repeated before they get encoded. However, we're combining symbols in the encoded domain. So we're combining encoded symbols. So, I'd further say that the specification itself recognizes that the order combination of combining and decoding also gets to the Alice Step 2 question Judge Rayner had earlier. Even if you find the combining step to be conventional, the order combination of the combining of these specific symbols and then decoding those combined symbols is unconventional. I would say that the specification itself does not admit the conventionality of this combination, or admit that the combination doesn't matter. The specification specifically asserts that it is novel and non-obvious, which is independently validated by the USPTO's grant of this patent over 35 U.S.C. 102 and 103. As recognized by the Federal Circuit in Berkheimer v. HP, that simply because something is simply because a claim element is disclosed in a piece of prior art, that is it's not novel, doesn't mean that it's well understood, routine, or conventional. So, the Federal Circuit has recognized novelty and obviousness as a higher bar to meet than even conventionality, which is like widespread use. Thank you, Your Honor.